BENTON, Judge,
concurring and dissenting.
I concur in the majority opinion except to the extent that it concludes that the “signing bonus” or “transitional compensation” appellant received on December 18, 1992, under an employment agreement he executed then, is properly treated as a marital asset.
The first step in determining which assets are part of the marital estate (and so subject to equitable distribution) is establishing the cut-off “date for determining marital assets and liabilities.” § 61.075(6), Fla.Stat. (1993). Here the trial court established the date on which the petition for dissolution was filed as the cut-off date. The former wife does not argue that the trial court should have chosen a cut-off date later than the filing date— November 17, 1992 — for determining which assets comprised the marital estate.[1]
A month after appellant filed the petition for dissolution (some sixteen months after the parties separated), the former husband started working for a different firm. As an inducement to make the change, his new employer paid him $122,784.00 on December 18, 1992. The trial court explained the parties’ positions:
[The former wife] argues that the signing bonus was given to the [former husband] in compensation for the large investment portfolio and deferred compensation benefits he acquired during the marriage. [The former wife] suggests that the bonus was given for the portfolio the [former husband] would bring with him to Prudential and the deferred compensation benefits he abandoned by leaving Shearson.
It became clear that the former wife’s reference to a “large investment portfolio” was a reference to assets not of the former husband but of investors for whom he acted as broker. After receiving the deposition of Mr. Grippi, the branch manager of Prudential Securities in Jacksonville who recruited appellant from Shearson, and listening to the testimony of Mr. Zell, a financial consultant at Shearson, the trial court ruled that
the signing bonus was given in consideration for work efforts performed during the marriage at Shearson and for the retention of certain existing clients the [former husband] would bring with him to Prudential. Further, the signing bonus *270 was not to replace post-marital earnings or commissions lost by the [former husband]. Therefore, the signing bonus is a marital asset and should be considered in distributing the property to accomplish and [sic] equitable distribution.
Allowing for income taxes, the trial court put the net value of the former husband’s initial income from his new firm at $93,000 and allocated half to the former husband and half to the former wife.
The “retention of certain existing clients” amounts to what has been called “personal goodwill.” Unlike a business’ goodwill, to which accountants customarily assign a monetary value, the earning capacity of an individual architect, engineer, physician, lawyer or stockbroker is not properly included as an asset subject to equitable distribution. An individual’s earning capacity is taken into account when decisions concerning alimony are made, but “goodwill, to be a marital asset, must exist separate and apart from the reputation or continued presence of the marital litigant.” Thompson v. Thompson, 576 So.2d 267, 270 (Fla.1991).
The evidence does not support the trial court’s implausible finding that Prudential paid the former husband for his “work efforts performed at ... Shearson.” Nor was there evidence to support the finding that Prudential did not pay the former husband partly to tide him over by “replac[ing] post-marital earnings or commissions lost,” i.e., forgone, by virtue of his departure from Shearson.
Mr. Grippi’s testimony was clear about the two reasons[2] for the “signing bonus”: to compensate appellant for “down time” he would experience in transferring from one firm to another and to give appellant an incentive to change firms.
Q First of all, what is transitional compensation?
A Well, as the term transitional compensation — as the name implies, it’s compensation paid for the act of transferring from one firm to another firm.
[[Image here]]
Q And why is transitional compensation paid?
A Well, for a couple of reasons. First of all, during that transitionary period that the broker is leaving one firm and joining the other, there’s down time in production. An enormous amount of paperwork must be completed so as to transfer the clientele of the financial advisor from the one firm to the other as well as the financial advisor gearing up and learning the policies and practices of his new firm.
The other reason for transitional compensation is simply as an incentive to make the financial advisor leave the firm that he’s working in to join our firm.
As the person who decided to pay transitional income to the former husband, Mr. Grippi was in a position to know why it was done. Mr. Zell did not contradict Mr. Grippi’s testimony that Prudential offered the signing bonus to compensate appellant for anticipated *271 down time and to provide an incentive for the move.
On cross-examination of Mr. Grippi, counsel sought to establish that Prudential paid the former husband because it was purchasing his “book of business.”
Q Basically you’re buying that broker’s— basically you’re buying that broker’s business, aren’t you? You’re buying that broker’s—
A Business is not the choice of words that I would use. I would say buying the person’s expertise, his experience, his ability to do future business.
[[Image here]]
Q So basically, basically, you are also buying his existing business, aren’t you?
You’re in a sense buying his contracts and investments with clients when you’re buying Mr. Reiss; isn’t that really how it is?
A If it were that easy, I would simply buy his client holding pages and disseminate those pages to the brokers that I already have.
[[Image here]]
Q Basically you’re — when you’re buying Mr. Reiss, you’re also buying his existing business, aren’t you?
A No. What I’m buying is his potential to do future business. The business that he did in the past does me no good. The business that he does in the past, however, does provide an indication to me of what his capabilities for the future are.
In fact, if appellant does not meet production requirements with Prudential for four years he may be terminated under subparagraph 3(b) of the employment agreement and if so will lose a pro rata portion of the signing bonus, under subparagraph 5.[3]
Mr. Zell’s testimony regarding “the book” was substantially the same, despite one ambiguous answer:
Q But what I am saying, what I am asking you is this: Can a broker sell his book without leaving the industry, first of all?
A It doesn’t make sense. Why would you buy it if he is going to stay in the industry and go ahead with you? I mean, that doesn’t make sense. No, he could not because the house has all of the records.
Say, you are going into the industry. You know, the house can go in there and sign accounts and tell everybody to start calling them.
Mr. Grippi testified what a broker’s book, or investment portfolio, is and whether it is something a firm can buy.
Q Now, would you define for us what a broker’s book is[?]
A Well, I would say that a broker’s book is the sum total of all of his clients.
Q Okay. And within the securities industry generally, can a broker sell his book? A Absolutely not.
Q And what is the monetary value of a broker’s book?
A It would be absolutely nothing without the broker.
Q And what, if any, value does a broker’s business have apart from his reputation and presence at a securities firm?
A None.
If a broker dies, her widower is not entitled to compensation for her bereaved clients’ assets. If a broker is fired, he competes with his former clients and others for “his” clients. His earning capacity, while undoubtedly dependent on his clients, is not a marital asset subject to equitable distribution.
In a dissolution action, “... the party alleging entitlement to an asset is generally required to introduce evidence which shows such entitlement.” Moon v. Moon, 594 So.2d 819 (Fla. 1st DCA 1992); Zaborowski v. Za *272 borowski, 547 So.2d 1296, 1297 (Fla. 5th DCA 1989). (“We deem it the burden of the claiming spouse, in this case the former wife, to prove what she claims, i.e., an interest in the pension plan and its value, in keeping with the recognized rule of law that he (or she) who claims must prove.”) As income he earned after the designated date for classifying marital assets, the former husband’s transitional income was his separate property. The trial court erred in holding that the signing bonus was a marital asset subject to equitable distribution, and its order should be reversed in this respect, too.

. The former husband argues that the trial court set the cut-off date too late. He contends the marital partnership ended in July of 1991, when the parties separated. Section 61.075(6), Fla. Stat. (1993) provides
The date for determining marital assets and liabilities and the value of such assets and the amount of such liabilities is the earliest of the date the parties enter into a valid separation agreement, such other date as may be expressly established by such agreement, or the date of the filing of a petition for dissolution of marriage, unless the trial judge determines another date is just and equitable under the circumstances.
Section 61.075(6), Fla.Stat. (Supp.1994), has eliminated the trial judge's discretion with respect to choosing the date for classifying assets as part of the marital estate.
The cut-off date for determining assets and liabilities to be identified or classified as marital assets and liabilities is the earliest of the date the parties enter into a valid separation agreement, such other date as may be expressly established by such agreement, or the date of the filing of a petition for dissolution of marriage. The date for determining value of assets and the amount of liabilities identified or classified as marital is such date or dates as the judge determines is just and equitable under the circumstances. Different assets may be valued as of different dates, as, in the judge's discretion, the circumstances require.

. Mr. Grippi testified that deferred compensation benefits were not taken into consideration when he calculated the amount of the signing bonus.
Q Assuming Mr. Reiss participated in a deferred compensation plan at Shearson wherein when he left to go to Prudential, he lost five years of those deferred compensation benefits, that's a factor that gets considered in arriving at the amount of the signing bonus, isn’t it?
A Well, not in this case, because I didn’t even know that he had it. So how could I arrive at that as being the dollar amount that I’d pay him if I didn't even know that he had a deferred compensation plan?
No rights to deferred compensation had vested when appellant left Shearson. Mr. Zell also testified that there is generally not a relationship between deferred compensation and the amount of bonus paid.
Q Is there any interrelationship between the bonus that is paid to the leaving stockbroker and the loss of the non-invested deferred compensation benefits?
A I don't see where this is a factor because some people might have a large deferred compensation and other people have very little in deferred compensation.
Mr. Grippi testified:
Q How is the amount of transitional compensation determined?
A I would say that, for the most part, the amount of transitional compensation is based upon the productivity level of the financial advisor during his prior 12 months of joining the firm.

. Mr. Grippi testified:
Q Now, if I understood your testimony correctly about the employment contract, [appellant’s] required to be employed — work for Prudential Securities for a period of four years, and he had minimum production requirements?
A Yes.
Q And is the purpose of that to ensure that in his future production he earns gross commissions to make the transitional compensation worth having paid it?
A Absolutely.